**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| VELOCITY HOLDING COMPANY, INC., *et al.*,[1] | Case No. 17-12442 (KJC) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF
ANTHONY FLANAGAN, CHIEF RESTRUCTURING
OFFICER OF VELOCITY HOLDING COMPANY, INC.,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Anthony Flanagan, hereby declare, under penalty of perjury:

      1.      I am the Chief Restructuring Officer ("CRO") of Velocity Holding Company, Inc.

("Velocity Holding"), a corporation organized under the laws of the state of Indiana and a debtor

and debtor in possession in the above-captioned cases of Velocity Holding and certain of its

debtor affiliates (collectively, the "Debtors").

      2.      I have served as a restructuring advisor to the Debtors, and as CRO for Velocity

Holding, since October 16, 2017.  I am generally familiar with the Debtors' day-to-day business

operations and financial affairs, including their books and records.  I submit this declaration (the

"Declaration") to assist the Court and parties in interest in understanding the circumstances that

compelled the commencement of these chapter 11 cases and in support of:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Velocity Holding Company, Inc. (1790); Velocity Pooling Vehicle, LLC (4630); Ed Tucker Distributor, Inc. (9197); Ralco Holdings, Inc. (0707); Rally Holdings, LLC (0707); Tucker Rocky Corporation (5967); Tucker-Rocky Georgia, LLC (8121); Motorsport Aftermarket Group, Inc. (0080); DFR Acquisition Corp. (4542); J&P Cycles, LLC (2512); Kuryakyn Holdings, LLC (2341); MAG Creative Group, LLC (4754); MAGNET Force, LLC (2635); Motorcycle Superstore, Inc. (1046); Motorcycle USA LLC (8994); Mustang Motorcycle Products, LLC (3660); Performance Machine, LLC (3924); Renthal America, Inc. (3827); and V&H Performance, LLC (2802).  The location of the Debtors' service address is 651 Canyon Drive, Suite 100, Coppell, Texas 75019.

(a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date"); and (b) the emergency relief that the Debtors have requested from the Court pursuant to the motions and applications described herein (collectively, the "First Day Motions").

3.       In addition to my role as the CRO of Velocity Holding, I am a Managing Director at AlixPartners, LLP ("AlixPartners") with over nineteen years of experience working in distressed situations and transactions.  My expertise includes developing, evaluating, and implementing business plans, developing cash flow projections, managing liquidity, analyzing parts profitability, and developing and implementing operational restructuring and cost reduction initiatives.   My experience also includes negotiating plans of reorganization, preparing liquidation scenarios, and negotiating debt/equity restructurings.

4.       An affiliate of AlixPartners, AP Services LLC ("APS"), was retained by the Debtors to provide consulting services to the Debtors regarding a potential restructuring of the Debtors' debt obligations.  APS's professionals have assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to the Debtors' chapter 11 cases.  APS, AlixPartners, its subsidiary affiliates, and its predecessor entities have provided restructuring or crisis management services in numerous large cases.  *See*, *e.g.*, *In re Caesars Entertainment Operating Company, Inc.*, No. 15-01145 (ABG) (Bankr. N.D. Ill. Mar. 6, 2015); *In re MPM Silicones, LLC*, No. 14-22503 (RDD) (Bankr. S.D.N.Y May 16, 2014); *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Aug. 10, 2012); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 28, 2012); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011); *In re Old Razor Co., LLC (f/k/a Am. Safety Razor Co.)*, No. 10-12351 (MFW) (Bankr.

D. Del. Aug. 24, 2010); *In re Neff Corp.*, No. 10-12610 (SCC) (Bankr. S.D.N.Y. July 16, 2010);

*In re U.S. Concrete, Inc.*, No. 10-11407 (PJW) (Bankr. D. Del. May 21, 2010); *In re Reader's*

*Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009); *In re Gen. Growth*

*Props., Inc.*, No. 09-11977 (ALG) (Bankr. S.D.N.Y. July 13, 2009); *In re Charter Commc'ns,*

*Inc.*, No. 09-11435 (JMP) (Bankr. S.D.N.Y. Apr. 15, 2009); *In re Metro Fuel Oil Corp.*, No. 12-

46913 (ESS) (Bankr. E.D.N.Y. Nov. 14, 2012); *In re ACG Holdings, Inc.*, No. 08-11467 (CSS)

(Bankr. D. Del. Aug. 11, 2008); *In re Tropicana Entm't, LLC*, No. 08-10856 (KJC) (Bankr. D.

Del. May 30, 2008).

5.     AlixPartners specializes in developing financing and operating strategies for

underperforming and troubled companies.  AlixPartners's debtor advisory services include a

wide range of activities targeted at stabilizing and improving a company's financial position,

including, among other things: (a) developing or validating business plans and related

assessments of a business's strategic position; (b) monitoring and managing cash, cash flow, and

supplier relationships; (c) assessing and recommending cost reduction strategies; (d) creating

financial analyses and reporting for companies embarking on, or currently operating under, the

protection of chapter 11; and (e) designing and negotiating financial restructuring packages,

including customer and supplier accommodations. Since its inception in 1981, AlixPartners has

been a global provider of turnaround advisory services to companies in crisis or those in need of

performance improvement in specific financial and operational areas.

6.     Except as otherwise indicated, all facts set forth in this Declaration are based upon

my personal knowledge, my discussions with members of the Debtors' management team and

the Debtors' advisors, my review of relevant documents and information concerning the

Debtors' operations, financial affairs, and restructuring initiatives, and my opinions based upon

my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

7.      To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these chapter 11 cases, this Declaration is organized in four sections.  The first section provides an overview of the Debtors' organizational structure and capital structure.  The second section provides detailed information on the Debtors' growth strategy and business operations.  The third section describes the circumstances leading to the commencement of these chapter 11 cases.  The fourth section sets forth the pertinent facts in support of each of the First Day Motions filed in connection with these chapter 11 cases.

## Introduction

8.      The Debtors, together with their non-Debtor affiliates (the "Company"), are a leading wholesale distributor, designer, manufacturer, retailer, and marketer of aftermarket parts, apparel, and accessories for the powersports industry.  As a result of a business combination in mid-2014 between certain of its current subsidiaries, the Company incurred approximately $400 million of first and second lien debt in the aggregate.  The Company's capital structure assumed continued growth in the U.S. powersports aftermarket and synergy-driven improvements to both sales and cost structure, which would result in an increase in sales and earnings for the Company and allow it to support its capital structure.  Unfortunately, notwithstanding the Company's global reach and strong customer relationships, this assumption proved incorrect, and the Company's financial performance has been declining in recent years as a result of, among other

things, a contraction in the U.S. powersports aftermarket.[2]  The impact on the Company's sales as a result of the market decline was significant, with projected 2017 sales being approximately 20% lower than 2014 sales.

9.      Beginning in 2016, the Company realized that the decline in the U.S. powersports aftermarket was not temporary and began actions to reduce its cost structure, including (a) consolidating multiple stocking locations for its retail business to a single location, (b) optimizing its distribution footprint by eliminating two distribution centers, (c) reorganizing its workforce to reduce its size and eliminate redundant positions, (d) rationalizing the Company's portfolio and exiting unprofitable businesses, and (e) engaging AlixPartners to assist the Company in its efforts to reduce the cost of direct and indirect materials and services and improve working capital and business processes.

10.      Despite these best efforts, however, the Company's business has continued to suffer.  A decline in earnings, coupled with the fixed capital structure and interest and principal payments on the Company's first and second lien debt, has resulted in an unsustainable deterioration of the Company's liquidity.

11.      In the face of increasingly constrained liquidity, the Debtors determined the best course of action was to engage in a comprehensive balance-sheet restructuring implemented through a chapter 11 process.  In connection therewith, beginning in October 2017, the Debtors engaged with certain of their lenders (the "DIP Lenders") under their asset-based credit agreement and first lien credit term loan facility regarding their willingness to fund such a process.  These discussions and subsequent negotiations resulted in the Debtors and DIP Lenders reaching mutual and agreeable terms for debtor in possession financing facilities of up to an

---

[2] The U.S. powersports aftermarket contracted approximately 2% in 2015, 6% in 2016 and 8% so far in 2017.

aggregate $135 million (the "DIP Financing") that will provide sufficient liquidity to fund these chapter 11 cases and, ultimately, the Debtors' post-emergence operations. Moreover, the Debtors were able to negotiate the framework for a consensual restructuring with their major creditor constituents, the terms of which are reflected in a restructuring support agreement (the "RSA"). The RSA contemplates a swift restructuring that transfers ultimate ownership of the Debtors to their First Lien Lenders (as defined below). I understand that the RSA is supported by (a) over 90 percent of the outstanding principal amount of the First Lien Term Loan (as defined below), some of whom also hold Second Lien Term Loans (as defined below) (collectively, the "RSA Parties"). And, although it is not party to the RSA as of the date hereof, I also understand that the agent under the Debtors' ABL Facility (as defined below) is supportive of the RSA and the restructuring contemplated thereby.

12.     In sum, the Debtors, the DIP Lenders, and the RSA Parties believe that this prearranged restructuring will maximize the value of the Debtors' estates and best position the Debtors for future success. Accordingly, the Debtors commenced these chapter 11 cases to implement the transactions contemplated by the RSA, and they believe the DIP Financing and the RSA provide a solid framework for an efficient trip through chapter 11, to the ultimate benefit of all the Debtors' stakeholders.

## General Background

### A.     Organizational Structure

13.     Velocity Holding is the direct or indirect parent of the foreign and domestic operating entities. A chart depicting the Company's prepetition organizational structure, including the non-Debtor entities, is attached hereto as **Exhibit A**.

6

**B.    The Company's Business Operations and Growth Strategy**

14.    The Company is a leading wholesale distributor, designer, manufacturer, retailer, and marketer of aftermarket parts, apparel, and accessories for the powersports industry.  The powersports industry is a subset of the broader motorsports industry and consists of vehicles such as motorcycles, all-terrain vehicles, "side-by-sides" or utility terrain vehicles, and snowmobiles, among others:

 



15.    The Company originated through a series of organic growth and strategic acquisitions.  Most recently, in March 2014, Motorsports Aftermarket Group, Inc. ("MAG") and Tucker Rocky Corporation, Inc. ("Tucker Rocky") entered into a definitive agreement to pursue a business combination.  The merger of MAG and Tucker Rocky was expected to create a leading vertically-integrated platform in the aftermarket powersports industry with a diversified group of product offerings through both owned and distributed brands.  Prior to the merger,

Tucker Rocky, a leader in wholesale distribution of aftermarket parts, apparel, and accessories for the powersports industry, was fully owned by LDI, Ltd. ("LDI"), while MAG, a leading independent designer, manufacturer, retailer, and marketer of branded aftermarket powersports parts and accessories, was a portfolio company of Leonard Green & Partners ("Leonard Green"). LDI and Leonard Green continue to own the majority of the equity in Velocity Holdings subsequent to the merger, and the Company is able to leverage these relationships to obtain favorable economic terms under certain key contracts.

16.    The Company achieves substantial efficiencies and competitive advantages by maintaining a diversified, vertically-integrated platform of brands, distributors, and retailers. The Debtors achieve these synergies through the integrated operation of three separate business divisions:



### 1.    Brands Division

17.    The "Brands" division designs, manufactures, sources, and markets finished goods and apparel under a variety of brand names that are market leaders in multiple business

segments. The Brands division manufactures its high ticket, larger technical items and sources smaller components, relying on on-site product design and engineering and a non-unionized workforce to achieve key competitive advantages. The Brands division sells its branded products to distributors, including to Tucker Rocky, in the Company's own Distribution division. Some of the key brands in the Brands division include Vance & Hines, the market leader in V-Twin exhaust parts and accessories; Mustang, the market leader in hand-crafted seats for cruiser motorcycles; Performance Machine, the market leader for high-end custom motorcycle wheels, brakes, and related accessories; and Progressive Suspension, the market leader in cruiser and touring suspension.



### 2.    Distribution Division

18.    The "Distribution" division purchases branded products and distributes them to a network of over 10,000 dealers for retail sale. The Distribution division is the second largest wholesale distributor of aftermarket parts, apparel, and accessories in the powersports industry and the leading distributor in the "Metric" motorcycle segment, with approximately 20 percent market share.

19.    The Company's dealer network includes franchise dealers (such as Harley

Davidson), traditional retail dealers, independent dealers (typically repair shops), and e-commerce dealers.  The Distribution division offers these dealers over 100,000 "SKUs" from a portfolio of more than 600 brands.  The offerings include goods purchased from the Company's own Brands division, goods purchased from third parties and repackaged by Tucker Rocky as "private label" brands, and third-party brands with strong brand equity.  The third-party brands tend to be leaders in their respective market segments, such as Dunlop (tires), Bridgestone/Firestone (tires), Arai (helmets), Cobra (exhausts and accessories), and Yuasa (batteries).  Brands from the Company's Brands division are responsible for approximately 20% of the Distribution division's sales, Tucker Rocky private label brands are responsible for approximately 5% of sales, and third-party brands are responsible for the balance of sales.

20.     The Distribution division leverages six, geographically-diverse supply distribution centers, including a dedicated supply distribution center in Louisville, Kentucky that exclusively serves the Company's "Retail" division, to quickly ship products and inventory to its customers throughout the United States, including one-day shipping to approximately two-thirds of the U.S.



### 3.      Retail Division

21.      The "Retail" division purchases branded finished goods from key distributors, including Tucker Rocky, who offer broad product lines in the motorcycle and aftermarket segments.  The Company builds demand for these products through online marketing, search engine optimization, and brand equity and then sells them directly to consumers at one of its three physical retail locations or through its online retail websites, including J&P Cycles (www.jpcycles.com).   J&P Cycles is the  leading online retailer in the powersports industry and the world's largest parts and accessories retailer for Harley Davidson and other cruising motorcycles through catalog, online, and physical locations.  The Retail division relies heavily on paid advertising on third-party search websites, such as Google, to drive traffic to both its online websites and its retail locations.

22.      In sum, the Company effectively operates as a "one-stop-shop" for its customers, and customers confidently use its services because of the quality and breadth of brands, parts, accessories and apparel it provides.

### C.      The Debtor's Prepetition Capital Structure.

23.      As of the Petition Date, the principal amount of the Debtors' consolidated funded debt obligations (the "Prepetition Debt Obligations") totaled approximately $440 million, comprised of: (a) approximately $65 million of obligations under the ABL Facility (as defined herein); (b) approximately $290 million of obligations under the First Lien Term Loan (as defined herein); and (c) approximately $85 million of obligations under the Second Lien Term Loan (as defined herein).  The Debtors are all co-borrowers and/or guarantors, with the sole exception of Tucker-Rocky Georgia, LLC, with respect to the Prepetition Debt Obligations (the

"<u>Loan Parties</u>").[3]  Velocity Pooling Vehicle, LLC, Ed Tucker Distributor, Inc., Ralco Holdings, Inc., Motorsport Aftermarket Group, Inc., Motorcycle Superstore, Inc., Renthal America, Inc., are each borrowers under the various Prepetition Debt Obligations (the "<u>Borrowers</u>").  Velocity Holding Company, Inc., Tucker Rocky Corporation, Inc., Rally Holdings, LLC, J&P Cycles, LLC, Motorcycle USA, LLC, Kuryakyn Holdings, LLC, MAGnet Force, LLC, MAG Creative Group, LLC, V&H Performance, LLC, Mustang Motorcycle Products, LLC, Performance Machine, LLC, and DFR Acquisition Corporation are each guarantors under the various Prepetition Debt Obligations (the "<u>Guarantors</u>").

###   I.    The Asset-Backed Credit Facility

24.    On May 14, 2014, the Debtors entered into that certain Credit Agreement by and among the Borrowers, as borrowers, General Electric Capital Corporation ("<u>GECC</u>"), as administrative agent,[4] and the lenders from time to time party thereto (the "<u>ABL Lenders</u>"), which currently provides for a revolving credit facility of up to $110 million, and letter of credit facilities which provide necessary liquidity and working capital for general corporate matters (the "<u>ABL Facility</u>").  The ABL Facility is secured by first liens on substantially all of the Borrowers' personal property, equity holdings and intellectual property rights, subject to the Prepetition Intercreditor Agreement.  Additionally, the ABL Facility is fully and unconditionally guaranteed by the Guarantors.  The ABL Facility accrues interest: (a) for base rate loans, at a flexible rate calculated by reference to the higher of the Federal Funds Rate, the Prime Rate as quoted by the Wall Street Journal, or the Eurocurrency Rate multiplied by the Statutory Reserve Rate plus 1.00%, plus an additional margin which varies based on the excess availability of the

---

[3] Tucker-Rocky Georgia, LLC will become a guarantor under the DIP Financing.
[4] Pursuant to an amendment to the ABL Facility, Wells Fargo Bank, National Association. ("<u>Wells Fargo</u>") replaced GECC as the administrative agent thereunder.

credit facility; and (b) for Eurocurrency loans, at a flexible rate calculated by reference to the Eurocurrency Rate multiplied by the Statutory Reserve Rate, payable quarterly.

25.     The ABL Facility matures on May 14, 2019.  As of November 15, 2017, the amount drawn, including through the opening of letters of credit, on the ABL Facility amounted to approximately $65.5 million, with another $15.6 million remaining in excess availability, which was reduced by a $15 million block on availability.

## II.     The First Lien Term Loan

26.     On May 14, 2014, the Debtors entered into that certain First Lien Credit Agreement by and among the Borrowers, as borrowers, Credit Suisse A.G. ("Credit Suisse"), as administrative agent, [5] and the lenders from time to time party thereto (the "First Lien Lenders"), pursuant to which the Company incurred approximately $295 million of initial principal indebtedness (the "First Lien Term Loan").  The First Lien Term Loan accrues interest at a rate calculated by reference to the higher of (a) for base rate loans, at a flexible rate calculated by reference to the higher of (i) the Federal Funds Rate plus 0.50%, (ii) the Prime Rate as set by Credit Suisse, (iii) the Adjusted Eurocurrency Rate for an interest period of 1M beginning on such day plus 1.00%, and (iv) 2.00% per annum; and (b) for Eurocurrency loans, at a flexible rate calculated by reference to the Eurocurrency Rate (to be no less than 1.00% per annum) multiplied by the Statutory Reserve Rate.  The First Lien Term Loan matures on May 14, 2021. The First Lien Term Loan is secured by first liens on substantially all of the Borrowers' personal property, equity holdings, and intellectual property rights, subject to the Prepetition Intercreditor Agreement.

---

[5] Pursuant to an amendment to the First Lien Term Loan, Wilmington Trust, N.A. ("Wilmington Trust") replaced Credit Suisse as the administrative agent thereunder.

### III.    The Second Lien Term Loan

27.    On May 14, 2014, the Debtors entered into that certain Second Lien Credit Agreement by and among the Borrowers, as borrowers, Credit Suisse A.G. ("Credit Suisse"), as administrative agent,[6] and the lenders from time to time party thereto (the "Second Lien Lenders"), pursuant to which the Company incurred approximately $85 million of initial principal indebtedness (the "Second Lien Term Loan").  The Second Lien Term Loan accrues interest at the same rate as the First Lien Term Loan.  The Second Lien Term Loan matures on May 14, 2022.  The Second Lien Term Loan is secured by second liens on substantially all of the Borrowers' personal property, equity holdings, and intellectual property rights, subject to the Prepetition Intercreditor Agreement.

### IV.    Equity

28.    Velocity Holding is the ultimate corporate parent of each of the Debtors and is the direct or indirect owner of a 100% interest in all of the Debtors.  The majority of Velocity Holding's outstanding equity is owned by Lacy Distribution, Inc.  A significant minority portion of the Company's outstanding equity is indirectly owned by Leonard Green, with a variety of other minority shareholders holding the remainder.

### D.    Circumstances Leading to These Chapter 11 Cases

### I.    The Company's Liquidity Constraints

29.    The Company's merger of Tucker Rocky and MAG in the middle of 2014 was financed through the Prepetition Debt Obligations, with the idea that growth in the post-recession powersports aftermarket would provide sufficient liquidity to fund both continued expansion of the Company and its debt service obligations.   As such, by mid-2014 the Company had

---

[6] Pursuant to an amendment to the Second Lien Term Loan, Medley Capital LLC ("Medley Capital") replaced Credit Suisse as the administrative agent thereunder.

approximately $380 million of first and second lien debt in the aggregate.  The Company's capital structure assumed continued growth in the U.S. powersports aftermarket and synergy-driven improvements to both the Debtors' sales and cost structures, which would result in an increase in sales and earnings for the Debtors and allow the Debtors to support their capital structure.

30.     Unfortunately, the U.S. powersports aftermarket instead contracted in the post-business combination years, with the market declining approximately 2% in 2015, 6% in 2016 and 8% so far in 2017.  The impact on the Company's sales as a result of the market decline was significant, with projected 2017 sales being approximately 20% lower than 2014 sales.  While there were operational efforts taken in an effort to streamline and accommodate the hostile market, the Debtors suffered a significant loss in earnings, as well as the liquidity to fund both their operations and their debt service obligations.

31.     Beginning in 2016, the Debtors began proactive measures to reduce their overall cost structure and adapt to the potential permanent decline in the U.S. powersports aftermarket industry.  These actions included, among other things:

- Consolidating multiple stocking locations for the Debtors' retail business to a single location;

- Optimizing the Debtors' distribution footprint, eliminating two distribution centers;

- Re-organizing the Debtors' human resources to eliminate redundant positions and reduce the overall size of the workforce; and

- Engaging AlixPartners to work with the Company to reduce the cost of direct and indirect materials and services, as well as improve working capital and business processes.

32.     The impact of these actions has been significant, with the projected annual profit improvement aggregating approximately $8 million to date, and with an additional $10 million

expected in 2018.  Despite these improvements, the Company's business has continued to suffer as a result of a decline of almost $175 million in sales in 2017 from 2014 levels.  Consequently, the adjusted EBITDA of the Debtors has declined from approximately $46 million in 2014 to approximately $20 million projected for 2017.  This decline in earnings, coupled with the fixed capital structure and interest and principal payments on the Prepetition Debt Obligations, has resulted in an unsustainable deterioration of the Company's liquidity.

## II.    Retention of Restructuring Advisors

33.    As noted above, in August 2016, facing the challenging business environment and cash structure constraints referenced in the previous section, the Debtors sought external strategic advice and assistance, engaging Proskauer Rose LLP ("Proskauer") as legal advisor. Concurrently, the Debtors retained AlixPartners to assist the Debtor with certain performance improvement initiatives.  APS was retained by the Debtors in October 2017 to provide myself as Chief Restructuring Officer and certain other personnel.[7]  Since Proskauer and APS's engagement, the Debtors and their advisors have engaged the major constituents in their capital structure regarding a value maximizing in-court restructuring.

## III.    Agreement on RSA and DIP Financing

34.    As result of these efforts, the Debtors were able to reach agreement on and finalize the terms of the RSA and DIP Financing.  The Debtors and the RSA Parties recognized that a comprehensive restructuring was necessary to deleverage the Debtors' balance sheet to ensure the Debtors' ability to operate as a going concern.

35.    The RSA was the product of extensive, arm's-length negotiation among the RSA

---

[7] AlixPartners and APS have relationships with parties in interest in this case including various vendors, existing lenders and potential financing sources.  In the coming days, APS will disclose its connections to the parties in interest in detail in the Debtors' application for an order authorizing APS's retention as restructuring advisor.

Parties.  It provides the framework for a swift restructuring under the Bankruptcy Code and works in tandem with the DIP Financing to facilitate the Debtors' reorganization as a going concern.  The DIP Financing provides the Debtors with debtor-in-possession financing facilities of up to $135 million that will provide the Debtors with sufficient capital to administer these chapter 11 cases

36.    Beginning in October 2017, the Debtors initiated a process designed to secure postpetition financing on the best available terms.  As part of this process, APS solicited proposals for DIP financing from the Prepetition Lenders.  APS did not solicit any other lenders with respect to providing the DIP financing because, among other things, the Debtors' recent financial performance was deteriorating due to negative market conditions, the Prepetition Lenders had a lien on substantially all of the Debtors' collateral, and the amount of the DIP financing needed.  Additionally, other lenders would likely not be willing to engage in a priming fight with the Prepetition Lenders.  Further, the Prepetition Lenders were unwilling to provide unsecured administrative credit, credit secured only by junior liens, or credit secured by foreign unencumbered assets.  They were, however, willing to provide debtor in possession financing on a senior-secured basis.

37.    Following receipt of the DIP Lenders' proposal for DIP financing, the Debtors and the DIP Lenders entered into arm's-length negotiations regarding the terms and the amount of the proposed DIP financing.  The proposed DIP Facilities include a budget (the "Budget") along with certain milestones and operational covenants, including delivery of schedules, assignments, financial statements, and weekly reports of receipts and budgeted cash usage.  The Debtors believe that the DIP Facilities will provide the Debtors with sufficient liquidity to continue uninterrupted operations and bridge to the consummation of the restructuring

transactions contemplated by the RSA, and is in the best interests of all stakeholders.

38.     Contemporaneous with obtaining the DIP Financing, the Debtors also entered into the RSA with certain of their prepetition First Lien Lenders.  The RSA provides for the reorganization of the Debtors as a going concern with a completely deleveraged capital structure and sufficient liquidity to fund the Debtors' postpetition business plan.  The key element of the reorganization contemplated by the RSA is the elimination of substantially all the Debtors' prepetition funded debt obligations, whereby the First Lien Lenders will become the ultimate common equity owners of the reorganized Debtors.  The RSA also provides for the cancellation of all existing equity interests.  Significantly, with the support of the DIP Lenders, the Debtors anticipate that substantially all vendors and trade creditors will receive payment in full on account of their claims, subject to certain conditions, through the Debtors' various "first day" relief.  This will minimize disruption to the Debtors' business on account of these chapter 11 cases, send a strong positive message to the Debtors' business partners and the powersports aftermarket generally, and prime the Debtors for success upon emergence.

39.     The RSA and DIP Financing seek to ensure that the Debtors move forward with the restructuring contemplated by the RSA, including the Term Sheet, as expeditiously as possible, with emergence expected to occur in or around April 2018.  Moreover, the RSA Parties have agreed to vote their claims in favor of any plan of reorganization consistent with the terms embodied in the RSA, so long as, among other things, the Debtors are pursuing confirmation of such a plan on the following timeline set forth in the DIP Financing and RSA (subject to certain adjustments):

- commencement of the chapter 11 cases on or before November 15, 2017;

- entry of an interim order approving the DIP Financing on or before November 20, 2017;

- obtain entry of a final order approving the DIP Financing on or before December 15, 2017;

- file a plan, disclosure statement, and motion to approve the disclosure statement on or before December 20, 2017;

- obtain entry of an order approving assumption of the RSA on or before January 16, 2018;

- obtain entry of an order approving the Disclosure Statement on or before February 8, 2018;

- obtain entry of an order confirming their plan of reorganization on or before March 26, 2018; and

- effective date of the plan of reorganization on or before April 24, 2018.

40.     In sum, the Debtors believe that the restructuring embodied in the RSA gives the Debtors the best opportunity to withstand current adverse market conditions, generate sufficient liquidity to fund their operations, and maximize value for the benefit of their stakeholders. Based on the foregoing, the Debtors have commenced these chapter 11 cases to implement their restructuring strategy and prevent further deterioration in the value of their business operations.

### E.     Relief Sought in the Debtors' First Day Motions[8]

41.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth reorganization of the Debtors.  I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases.   A description of the relief requested in and the facts

---

[8] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

supporting each of the First Day Motions is set forth below.

**I.      Debtors Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief ("Joint Administration Motion")**

42.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) granting related relief.   Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

43.      Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.  For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration of these chapter 11 cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of eighteen independent chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**II.      Debtors' Application for Entry of an Order (I) Authorizing and Approving the Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent and (II) Granting Related Relief (the "Claims Agent Application")**

44.      Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Donlin, Recano & Company, Inc. ("DRC") as the Claims and Noticing Agent for the Debtors in their chapter 11 cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these chapter 11 cases.

45.     In accordance with the Claims Agent Protocol, prior to the selection of DRC, the Debtors reviewed and compared engagement proposals from three court-approved claims and noticing agents, including DRC, to ensure selection through a competitive process.   I believe, based on the engagement proposals obtained and reviewed, that DRC's rates are competitive and reasonable given DRC's quality of services and expertise.

46.     Given the complexity of these chapter 11 cases and the number of creditors and other parties in interest involved in these chapter 11 cases, I believe that appointing DRC as the notice and claims agent in these chapter 11 cases will maximize the value of the Debtors' estates for all its stakeholders.

**III.     Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) Authorizing the Debtors to Modify Certain Personal Identification Information for Individual Creditors, (III) Limiting Notice Required under Bankruptcy Rule 2002, and (IV) Granting Related Relief (the "<u>Creditor Matrix Motion</u>")**

47.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, (b) authorizing the Debtors to modify certain personal identification information for individual creditors, and (c) limiting notice required under Bankruptcy Rule 2002.   Because requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings, I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, will maximize the value of the Debtors' estates and is in the interests of all of the Debtors' stakeholders.   Moreover, I believe that cause exists to authorize the Debtors to modify the address information of individual creditors—many of whom are the Debtors' employees—

provided on the Creditor Matrix because such information could be used to perpetrate identity theft.  Accordingly, I believe the Creditor Matrix Motion should be approved.

**IV.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code and (B) Utilize Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief (the "DIP Motion")**

48.     The DIP Motion requests authority to enter into senior secured DIP Facilities (consisting of an ABL DIP Facility of up to $110 million and a Term DIP Facility of $25 million) and to continue using Cash Collateral pursuant to the terms of the Interim DIP Order.  I believe the DIP Facilities will provide the Debtors with liquidity to stabilize and fund the Debtors' general and corporate operations during these chapter 11 cases.

49.     As of the Petition Date, I believe the Debtors lack sufficient liquidity to operate. Absent entry into the DIP Facilities, I believe the Debtors will have no alternative but to immediately cease operating and convert these cases to cases under chapter 7 of the Bankruptcy Code.  The liquidity provided by the DIP Facilities will ensure the Debtors can continue to operate in the ordinary course of business, which will ensure continued, uninterrupted operations, preserving the value of the estate for the benefit of all stakeholders.

50.     I believe the DIP Facilities were the product of an arm's-length negotiation with the DIP Lenders.  Beginning in October 2017, I understand that the Debtors initiated a process designed to secure postpetition financing on the best available terms.  As part of this process, APS solicited proposals for DIP financing from the Prepetition Lenders and  did not solicit any other lenders with respect to providing the DIP financing because, among other things, the Debtors' recent financial performance was deteriorating due to negative market conditions, the Prepetition Lenders had a lien on substantially all of the Debtors' collateral, and the amount of

the DIP financing needed.  Additionally, other lenders would likely not be willing to engage in a priming fight with the Prepetition Lenders.  Further, the Prepetition Lenders were unwilling to provide unsecured administrative credit, credit secured only by junior liens, or credit secured by foreign unencumbered assets.  They were, however, willing to provide debtor in possession financing on a senior-secured basis.

51.    Following receipt of the DIP Lenders' proposal for DIP financing, the Debtors and the Prepetition Lenders entered into exhaustive arm's-length negotiation regarding the terms and the amount of the proposed DIP financing.  Following these negotiations, the Debtors and the DIP Lenders reached an agreement on the terms of DIP Facilities of up to $135 million that will provide the Debtors with sufficient capital to administer these chapter 11 cases.  The proposed DIP Facilities include a budget (the "Budget") along with certain milestones and operational covenants.  I believe that the DIP Facilities will provide the Debtors with sufficient liquidity to continue uninterrupted operations and reorganize effectively, and is in the best interests of all stakeholders.

52.    I believe the requested relief is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors are denied the liquidity that would be provided by the DIP Facilities pursuant to the Interim DIP Order and the Final DIP Order.  Accordingly, I respectfully submit that the DIP Motion should be approved.

**V.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief ("Cash Management Motion")**

53.    Pursuant to the Cash Management Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (i) continue to operate their cash management system; (ii) honor

certain prepetition obligations related thereto; (iii) maintain existing business forms in the ordinary course of business; and (iv) continue to perform intercompany transactions consistent with historical practice; (b) granting superpriority administrative expense status to postpetition intercompany balances; and (c) granting related relief.

54.     The Cash Management System is comparable to the cash management systems used by similarly situated, business enterprises to manage the cash of operating units in an efficient and cost-effective manner.  The Debtors use the Cash Management System in the ordinary course of its businesses to collect, transfer, and disburse funds generated from its operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' senior management maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds from the Debtors' corporate headquarters in Texas.  Additionally, the Debtors' corporate accounting department reconciles the Debtors' books and records to ensure that all transfers are accounted for properly on a timely basis.

55.     I understand that the Debtors historically have engaged, in the ordinary course of business, in routine business relationships with each other and certain of their non-Debtor affiliates (collectively, the "Intercompany Transactions"), resulting in intercompany receivables and payables (collectively, the "Intercompany Claims").  The Debtors typically engage in Intercompany Transactions to, among other things, process payroll, provide enterprise-wide management and support services, and facilitate operations on a daily basis.

56.     It is my understanding, in connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted between the Debtors and/or their non-Debtor affiliate, at any given time

there may be intercompany balances owing by one Debtor to another Debtor or to a non-Debtor affiliate. The Intercompany Transactions are traceable, and the Debtors intend to account for all postpetition Intercompany Transactions in accordance with past historical practice.

57.    The Debtors historically have reflected Intercompany Claims as journal entry receivables and payables, invoicing, and loan agreements, as applicable, in the respective Debtor or non-Debtor affiliate's accounting system. I understand that the Debtors track all fund transfers in their respective accounting system and reconcile cash movement globally on a weekly basis and, therefore, can ascertain, trace, and account for such Intercompany Transactions.

58.    I believe that the continuation of the Debtors' Cash Management System is essential to the Debtors' business and any disruption in the Debtors' use of the Cash Management System would severely disrupt the Debtors' business. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**VI.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief ("Wages Motion")**

59.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto; and (b) granting related relief.

60.    As of the Petition Date, the Debtors employ approximately 1,800 salaried or hourly basis Employees in the aggregate.  In addition, the Debtors currently retain approximately 25 Independent Contractors and approximately 10 Temporary Staff although this number fluctuates based on the Debtors' specific needs at any given time.  The Independent Contractors and Temporary Staff are a critical supplement to the efforts of the Debtors' Employees.  The vast majority of Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families, and will be exposed to significant financial constraints if the Debtors are not permitted to continue paying compensation, provide employee benefits, and maintain existing programs.

61.    The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected.  The Debtors are seeking authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, expense reimbursements, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions), health insurance, workers' compensation benefits, paid time off, other paid leave, unpaid leave, life and accidental death and dismemberment insurance, short- and long- term disability coverage, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business and as further described in the Wages Motion.

62.    I believe that the Employees and Independent Contractors provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees and Independent Contractors, the Debtors may experience Employee turnover and instability at this critical time in

these chapter 11 cases.  Additionally, I understand that a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. I therefore believe that payment of certain prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees and Independent Contractors as the Debtors seek to operate their business in these chapter 11 cases.

**VII.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of (A) Trade Claimants, (B) Foreign Vendors, (C) Lien Claimants, and (D) 503(B)(9) Claimants, and (II) Granting Related Relief (the "Trade Motion")**

63.    The Debtors request the entry of interim and final orders (a) authorizing the Debtors to pay (i) Trade Payable Claims in an amount not to exceed the applicable trade payable cap with respect to both interim and final periods, (ii) Foreign Claims, (iii) Lien Claims, and (iv) 503(b)(9) Claims, and (b) granting related relief.

64.    It is my understanding that the Company's success depends upon close coordination and integration not only among its subsidiaries and affiliates, but also its vendor, supplier, and dealer base.  Moreover, each business and brand typically has its own unique supplier base.  Given the highly integrated nature of the Company's operations, any disruption to the supplier base at a particular business unit or brand could have significant cascading, negative effects on the other business units or brands that rely upon it.  In many instances, these suppliers are the only viable source of a particular product or service.  Given the nature of the powersports industry, the inability to procure a specialty product from the Company often leads customers to search elsewhere, either because of strong brand loyalty or because of quality concerns about alternatives.

65.     As set forth in further detail in the Graves Declaration, because of the limited availability of vendors able to provide the Debtors with the specialized goods and/or services necessary to operate the business in an efficient manner, preservation of the Debtors' relationships with their existing suppliers is crucial.

66.     In addition, due to the global nature of the Debtors' businesses, they regularly transact with certain vendors, suppliers, and service providers located in foreign jurisdictions.[9] The Foreign Vendors are generally sole-source, long-term vendors and suppliers located primarily in Southeast Asia.  These Foreign Vendors produce finished apparel goods, such as full jackets, pants, and gloves, and assembly kits for powersports parts and accessories that are built to design specifications provided by the Brands division.  Due to long-term relationships with most of the Foreign Vendors, these vendors have intimate knowledge of the Debtors' operations and product offerings that would be difficult to replicate in a short timeframe.  In many cases, an alternative source may not be available at all.  Even if an alternative domestic or foreign vendor could be identified, the cost and duration of any transition could have significant long-term impact on the Debtors' business.  The Debtors estimate that, conservatively, it would take between 12–18 months to bring a new vendor up to speed for assembly kit production and 6–12 months for production related to the Company's "private label" brands.  Given the seasonality of the Company's business, production is just now ramping up in anticipation of the Company's March–June "high" season.  Switching to a new vendor at this sensitive period in their inventory

---

[9] Foreign Vendors shall not include foreign vendors, service providers, and other non-governmental entities if the legal entity that is obligated to provide goods or services to the Debtors is known to have material assets within the United States that would be subject to the jurisdiction of the Court and that would be available to satisfy a judgment entered by the Court if such entities were to violate the automatic stay provisions of section 362 of the Bankruptcy Code or otherwise take any action contrary to an order of the Court or the provisions of the Bankruptcy Code.

build-up would therefore jeopardize the Debtors' entire 2018 sales season.  Moreover, the Company—and its customers—have come to rely on the quality of the goods produced by the Foreign Vendors and in an industry particularly sensitive to minor swings in quality, any shift to a vendor that is not of comparable quality could harm the Debtors' reputation and drive customers elsewhere.

67.    The Debtors also require the delivery of goods and the provision of services on a regular basis for the production and distribution of their finished products throughout the world. The Debtors' business operations rely on their ability to distribute finished goods in a timely fashion.  In particular, the Debtors' distribution network depends upon the use of reputable domestic and foreign common carriers, truckers, rail carriers, barge owners and dockers to deliver goods to the Debtors' production facilities and distribute products to the Debtors' customers.  The services provided by the Shippers are essential to the Debtors' daily operations. At any given time, there are numerous shipments of products at various points in production or to the Debtors' customers.  Thus, it is a certainty that some of the Shippers are currently in possession of the Debtors' property.  The delivery of these goods is vital to maintaining the Debtors' operations during their transition into, and ultimately their emergence from, chapter 11.

68.    Finally, the Debtors may have received certain goods or materials within the 20-day period immediately preceding the Petition Date, thereby giving rise to claims accorded administrative priority under section 503(b)(9) of the Bankruptcy Code.  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, the Debtors obtain goods or other materials from such claimants on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its 503(b)(9) Claims.  Such refusal could negatively affect the Debtors' estates as the Debtors' business is

dependent on the steady flow of goods for its manufacturing and distribution operations.

69.     In return for paying the Trade Payable Claims, the Foreign Claims, and the Lien Claims, the Debtors will use commercially reasonable efforts to require the applicable Trade Claimant, Foreign Vendor, or Lien Claimant, as applicable, to provide trade terms in line with historical practice for the postpetition delivery of goods and services or otherwise continue supplying the Debtors with essential goods and services for the duration of these chapter 11 cases.  The Debtors therefore intend, subject to the exercise of their business judgment, to condition payment upon such party's written agreement to continue supplying goods or services to the Debtors in accordance with trade terms at least as favorable to the Debtors as those practices and programs (including credit limits, pricing, timing of payments, availability, and other terms) in place in the 60 days prior to the Petition Date plus 15 days.

70.     I believe that the relief requested in the Trade Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Trade Motion should be approved.

**VIII.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Honor the Terms of Their Premium Financing Agreement and Pay Premiums Thereunder, and (D) Enter Into New Premium Financing Agreements in the Ordinary Course of Business, and (II) Granting Related Relief ("<u>Insurance Motion</u>")**

71.     Pursuant to the Insurance Motion, the Debtors seek entry of an order  (a) authorizing the Debtors to (i) continue existing insurance coverage entered into prepetition and satisfy payment obligations related thereto, (ii) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business, (iii) honor the terms of the Premium Financing Agreement and pay premiums thereunder, (iv) enter into new premium financing

agreements in the ordinary course of business; and (b) granting related relief.

72.    In the ordinary course of business, the Debtors maintain approximately twenty-six (26) insurance policies, administered by various insurance carriers.  These policies provide coverage for, among other things, the Debtors' property, general liability, warehouse stock, workers' compensation, umbrella coverage, excess liability, automobile liability, transportation liability, earthquake coverage, directors and officers liability, and directors and officers runoff coverage.  The aggregate annual premium for the Insurance Policies, excluding the Workers' Compensation Program, is approximately $1.5 million, plus applicable taxes and surcharges.

73.    Some, but not all, of the Insurance Policies are financed through a premium financing agreement with First Insurance.  Pursuant to the Premium Financing Agreement, the Debtors are required to make a down payment and ten monthly premium payments totaling approximately $745,000 beginning on July 1, 2017.  As of the Petition Date, there are six monthly payments, totaling approximately $352,000, remaining on account of the Premium Financing Agreement.

74.    The Workers' Compensation Program is a self-funded program through which the Debtors provide insurance for employees at the levels required by laws in the states in which the Debtors operate and pre-fund expected losses on an annual basis.  Under their current policies, at the end of the policy year, the Debtors conduct an audit of the actual losses and either receive a refund from Sentry for any overpayments or pay additional amounts to cover any shortfall.  Total premiums plus expected losses for the 12-month period beginning June 2017 and ending May 2018 are approximately $2.5 million and are paid in equal monthly installments.  Under policies for past years, the Debtors are required to satisfy deductible requirements before the insurer, The Travelers Indemnity Company, begins providing coverage.  As of the Petition

Date, the Debtors owe approximately $1.4 million on account of current policy year premiums and expected losses, and pay approximately $50,000 per month in satisfaction of claim deductible requirements on account of prior policy years, related to the Workers' Compensation Program.

75.     With respect to (a) the Insurance Policies not covered by the Premium Financing Agreement and (b) the Workers' Compensation Program, the Debtors either prepay the entire yearly premium on or around the start date of each policy period or reimburse LDI Ltd., LLC, one of the major equity holders of Debtor Velocity Holding Company, Inc., on account of such prepayment.  The Insurance Policies renew throughout the year, predominantly in June, and the Premium Financing Agreement renews in July.  The Debtors estimate that, as of the Petition Date, there are no outstanding premiums due on account of the non-financed Insurance Policies, excluding the Workers' Compensation Program.

76.     As of the Petition Date, and excluding the Workers' Compensation Program, the Debtors do not believe there are any amounts outstanding on account of the Insurance Policies. Nevertheless, out of an abundance of caution, the Debtors seek authority to continue honoring any amounts owed on account of the Insurance Policies in the ordinary course of business on a postpetition basis to ensure uninterrupted coverage under the Insurance Policies.

77.     The Debtors obtain the majority of their Insurance Policies through their insurance broker, Arthur J. Gallagher.  Gallagher assists the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, assisting the Debtors with claims, and providing ongoing support throughout the applicable policy periods.  The Debtors pay Gallagher an annual fee included in the premium and/or a commission for services rendered indirectly through LDI.  As

of the Petition Date, the Debtors owe no amounts to LDI on account of fees, commissions, or any other prepetition obligations already paid to Gallagher.

78.    Continuation and renewal of the Insurance Policies and Premium Financing Agreement and entry into new insurance policies and premium financing agreements is essential to preserving the value of the Debtors' business, properties, and assets.  Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the U.S. Trustee.  I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**IX.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief ("<u>Taxes Motion</u>")**

79.    The Taxes Motion seeks the authority to remit and pay Taxes and Fees that accrued before the Petition Date and will become payable during the pendency of these cases. The Debtors also request that the Court authorize applicable financial institutions, when the Debtors so request, to receive, process, honor, and pay any and all checks or electronic payment requests in respect of the Taxes and Fees.

80.    In the ordinary course of business, the Debtors collect, withhold, and incur sales, use, income, and property taxes, as well as environmental and business fees, as more fully described in the Taxes Motion.  The Debtors estimate that approximately $2.3 million in Taxes and Fees relating to the prepetition period will become due and owing to the Authorities after the Petition Date.  Payment of the Taxes and Fees is critical to the Debtors' continued and

uninterrupted operations.  The Debtors' failure to pay prepetition Taxes and Fees may cause the Authorities to take precipitous action, including, but not limited to, conducting audits, filing liens, preventing the Debtors from doing business in certain jurisdictions, seeking to lift the automatic stay, or pursuing payment of the Taxes and Fees from the Debtors' officers and directors, all of which would greatly disrupt the Debtors' operations and ability to focus on their reorganization efforts.

81.    I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**X.    Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief ("Utilities Motion")**

82.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders (a) approving the Proposed Adequate Assurance of payment for future utility services; (b) prohibiting Utility Companies from altering, refusing, or discontinuing services; (c) approving the Debtors' proposed procedures for resolving Additional Assurance Requests; and (d) granting related relief.

83.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, propane, telecommunications, water, waste management (including sewer and trash), internet, cable, and other similar services from a number of utility companies or brokers.  On average, the Debtors pay approximately $233,000 each month for third party Utility Services, calculated as a historical average from the twelve-

month period ended October 31, 2017.  To the best of the Debtors' knowledge, the Debtors do not have any existing prepayments with respect to any Utility Companies.

84.     Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.   Indeed, any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations.  I believe this disruption would adversely impact customer relationships and result in a decline in the Debtors' revenues and profits.   Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  It is critical, therefore, that Utility Services continue uninterrupted during these chapter 11 cases. Accordingly, I believe that the Utilities Motion should be approved.

**XI.     Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief ("<u>Customer Programs Motion</u>")**

85.     Pursuant to the Customer Programs Motion, the Debtors seek entry of an order authorizing the Debtors to maintain and administer their customer-related programs and honor certain prepetition obligations related thereto, and (b) granting related relief.

86.     In the ordinary course of conducting their businesses, the Debtors provide certain incentives, discounts, and accommodations to their customers in order to attract and maintain positive customer relationships.   The Customer Programs promote customer satisfaction and ultimately enhance the Debtors' cash flow.

87.     In certain instances, customers would likely not purchase the Debtors' services if the customers were not offered participation in the Customer Programs, particularly given that the Debtors' competitors offer their own customer programs.   Maintaining the loyalty, support, and goodwill of their customers is critical to the Debtors' reorganization efforts.  I believe that

their ability to continue the Customer Programs and to honor their obligations thereunder in the ordinary course of business is necessary to retain their brand value, meet competitive market pressures, and ensure customer satisfaction, thereby retaining current customers, attracting new ones, and, ultimately, enhancing revenue and profitability for the benefit of all the Debtors' stakeholders.  It is essential, therefore, that Customer Programs continue uninterrupted during these chapter 11 cases.  Accordingly, I believe that the Customer Programs Motion should be approved.

[*Remainder of page left intentionally blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 15, 2017                    Respectfully submitted,

                                            */s/ Anthony Flanagan*_____

                                            Anthony Flanagan
                                            Chief Restructuring Officer

**<u>Exhibit A</u>**

**Organizational Chart**

## Corporate Organizational Chart

